Peter C. D'Apice
State Bar No. 05377783
Jacob L. Newton
State Bar No. 24046523
Briana L. Cioni
State Bar No. 24044161
**STUTZMAN, BROMBERG, ESSERMAN & PLIFKA**
A Professional Corporation
2323 Bryan Street, Suite 2200
Dallas, TX 75201-2689
Phone:  (214) 969-4900
Facsimile:  (214) 969-4999

### IN THE UNITED STATES BANKRUPTCY COURT
### SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | Chapter 11 |
| | § | |
| Green 126 LP, *et al.*, | § | Case No. 08-36470 |
| | § | |
| Debtors | § | **(Jointly Administered)** |
| | § | |
| | § | Hearing: February 11, 2009 |
| | § | 10:00am |

### MOTION FOR RELIEF FROM AUTOMATIC STAY

**THIS IS A MOTION FOR RELIEF FROM THE AUTOMATIC STAY.  IF IT IS GRANTED, THE MOVANT MAY ACT OUTSIDE OF THE BANKRUPTCY PROCESS.  IF YOU DO NOT WANT THE STAY LIFTED, IMMEDIATELY CONTACT THE MOVING PARTY TO SETTLE.  IF YOU CANNOT SETTLE, YOU MUST FILE A RESPONSE AND SEND A COPY TO THE MOVING PARTY AT LEAST TWO DAYS BEFORE THE HEARING.  IF YOU FILE YOUR RESPONSE LESS THAN 5 DAYS BEFORE THE HEARING, YOU MUST SEND A COPY TO THE MOVANT BY FACSIMILE, BY HAND, OR BY ELECTRONIC DELIVERY.  IF YOU CANNOT SETTLE, YOU MUST ATTEND THE HEARING.  EVIDENCE MAY BE OFFERED AT THE HEARING AND THE COURT MAY RULE.**

**REPRESENTED PARTIES SHOULD ACT THROUGH THEIR ATTORNEY.**

**THERE WILL BE A HEARING ON THIS MATTER ON WEDNESDAY FEBRUARY 4, 2009 AT 9:00 A.M. IN COURTROOM 403, 4TH FLOOR, 515 RUSK AVENUE, HOUSTON, TEXAS  77002.**

TO THE HONORABLE BANKRUPTCY JUDGE KAREN K. BROWN:

LMREC CDO II REO I, Inc. ("LMREC"), a secured creditor of Greens 126 LP, Oaks 198 LP and Trails 240 LP (collectively, the "Debtors"), Debtors in the above-referenced jointly administered cases (the "Bankruptcy Cases"), by and through its counsel of record, hereby files this Motion for Relief from Automatic Stay (the "Motion"), pursuant to 11 U.S.C. § 362, Fed. R. Bankr. P. 4001 and BLR 4001, and respectfully represents as follows:

## INTRODUCTION

1.     After previous defaults on their loan obligations to Legg Mason (as defined below) and resolving such defaults two previous times in a four-month period, the Debtors then again defaulted on their loan obligations.  In a desperate attempt to prevent Legg Mason from exercising its state law foreclosure rights, the Debtors, each a single asset real estate entity, filed for bankruptcy protection within a half-hour of the scheduled foreclosure time.  The Debtors have been enjoying the protections of the Bankruptcy Code for almost ninety days.

2.     The ninety-day period made applicable to a single asset real estate debtor by Bankruptcy Code § 362(d)(3) was specifically engineered by Congress to allow a single asset real estate debtor an opportunity to reorganize while recognizing that such a debtor should not be able to hide out in bankruptcy waiting for a change in the market, or any other miracle, to allow the debtor to continue to maintain ownership of its property all the while preventing its secured creditor from exercising its state law rights.  The ninety-day period is set to expire on January 7, 2009, and it appears that little to no progress has been made towards a successful reorganization.

3.     When filing for bankruptcy relief nearly ninety days ago, the Debtors believed that their secured lender, Legg Mason (as defined below), was oversecured and maintained a modest equity cushion.  Thus, a successful reorganization through procuring a loan to take out Legg Mason seemed plausible.  However, Legg Mason recently conducted a post-petition appraisal revealing an enormous drop in the value of its collateral, leaving it undersecured.  Consequently, any equity cushion held by Legg Mason has vanished along with any reasonable possibility for the Debtors to reorganize. A reorganization as envisioned by the Debtors is simply not feasible given the current value of the property, which in all probability will continue to decrease in value, and given the current economic climate and the chilling effect it is having on lending. Moreover, as Legg Mason is now the Debtors' largest general unsecured creditor, Legg Mason will be able to block virtually any Plan of Reorganization from being confirmed even under the "cram-down" provision provided by the Bankruptcy Code.  Further, in the ninety-day period provided by the Bankruptcy Code for Debtors to reorganize, Debtors have made virtually no progress as illustrated by the fact that Debtors have yet to even retain a mortgage broker to procure the permanent financing Debtors intend to use as the cornerstone for their reorganization.  Accordingly, because a confirmable plan of reorganization will clearly not be filed, let alone confirmed, within the Debtors' ninety-day period or in any reasonable amount of time thereafter, Legg Mason respectfully requests this Court to lift the automatic stay to allow Legg Mason to non-judicially foreclose on its collateral.

## JURISDICTION AND VENUE

4.     This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C.  § 157(b).  Venue is properly before this Court pursuant to 28 U.S.C. § 1408

## BACKGROUND

### A.     *Debtors and Legg Mason enter into the Note and Deed of Trust*

5.     Legg Mason Real Estate Capital II, Inc. ("LMREI") and Debtors entered into that certain mortgage loan (the "Loan"), evidenced by that certain Promissory Note (the "Note") in the principal amount of $11,000,000, executed by the Debtors in favor of LMREI, dated as of January 25, 2007.  A copy of the Note is attached as **Exhibit 1** to the Declaration of Wallace O. Sellers attached hereto as **Exhibit A** (the "Sellers Declaration").

6.     The Note is secured by, among other things, certain real property of the Debtors and rents, as evidenced in the Deed of Trust, Security Agreement and Financing Statement, dated as of January 25, 2007, attached as **Exhibit 2** to the Sellers Declaration, (the "Deed of Trust"), and the Assignment of Lease and Rents, attached as **Exhibit 3** to the Sellers Declaration, (the "Assignment of Rents"), dated as of January 25, 2007 (the Deed of Trust, the Assignment of Rents, the Note and other documents evidenced by the Loan will be collectively referred to as the "Loan Documents").  Both the Deed of Trust and the Assignment of Rents were recorded against certain real property located at 5454 West Gulf Bank, Houston, Texas, 77088, 5350 West Gulf Bank, Houston, TX  77088 and 5300 Gulf Bank, Houston, Texas  77088 (collectively, the "Property") on February 6, 2007, with the County Clerk of Harris County, Texas, as respective Document Nos.

20070075436 and 20070075437.

7.      Section 1.14 of the Deed of Trust sets forth Legg Mason's security interest in the rents and profits (collectively, the "Rents") from the Property.  Legg Mason's security interest in the Rents is also evidenced by the Assignment of Rents and the UCC Financing Statements, filed with the Texas Secretary of State on January 31, 2007, file Nos. 07-0003557986, 07-0003557764 and 07-0003557875, and as amended by file Nos. 07-00058876, 07-00058872 and 07-00058874 filed on February 21, 2007 (the "UCC Financing Statements").  The UCC Financing Statements are attached as **Exhibit 4** to the Sellers Declaration.

8.      The Loan Documents were assigned by LMREI to Legg Mason Real Estate CDO II, Corp. ("LM CDO") pursuant to the Assignment and Assumption of Deed of Trust, Security Agreement and Financing Statement and other Loan Documents, dated January 30, 2007, and recorded on February 15, 2007, with the County Clerk of Harris County, Texas, Document No. 20070099052.  The LM CDO Assignment is attached as **Exhibit 5** to the Sellers Declaration.

9.      The Loan Documents were then assigned by LM CDO to LMREC pursuant to the Assignment and Assumption of Loan Documents, dated October 3, 2008, which was recorded on October 7, 2008, with the County Clerk of Harris County, Texas, Document No. 20080506359 (LMREI, LM CDO and LMREC are hereafter referred to individually or collectively as "Legg Mason").  The LMREC Assignment is attached as **Exhibit 6** to the Sellers Declaration.

**B.      *Debtors defaulted on the loan obligations***

10.      On or about May 20, 2008, Legg Mason sent a default notice to the

Debtors advising Debtors that they were in default of their loan obligations under the Note, and accelerating all amounts due and owing under the Note.  A copy of the May 20, 2008 default notice is attached as **Exhibit 7** to the Sellers Declaration.

11.     Debtors and Legg Mason subsequently came to an agreement in respect to resolving the May 20, 2008 default.

12.     Debtors again defaulted on their loan obligations and as a result Legg Mason, on or about July 14, 2008, sent another default notice to the Debtors advising Debtors that they were in default of their loan obligations under the Note, and accelerating all amounts due and owing under the Note.  A copy of the July 14, 2008 default notice is attached as **Exhibit 8** to the Sellers Declaration.

13.     Debtors and Legg Mason came to an agreement in respect to resolving the July 14, 2008 default.

14.     Debtors once again, and for a third time, defaulted on their loan obligations and Legg Mason sent a default notice to Debtors on or about September 10, 2008, advising Debtors that they were in default of their loan obligations under the Note, and accelerating all amounts due and owing under the Note.  A copy of the September 10, 2008 default notice is attached as **Exhibit 9** to the Sellers Declaration.

*C.     Legg Mason initiated foreclosure proceedings*

15.     Debtors failed to cure the September 10, 2008 default.  Accordingly, Legg Mason proceeded to exercise its state law rights and non-judicially foreclose on its Deed of Trust on the Property.

16.     On or about September 16, 2008, Legg Mason instructed its Trustee under the Deed of Trust, as substituted, to file with the Official Record of Harris County, Texas

and to post in the Harris County, Texas Family Law Center, a Notice of Substitute

Trustee's Sale (the "Notice of Sale"), which provided that the foreclosure sale would be

held on October 7, 2008, between 10:00 a.m. and 1:00 p.m.  The Notice of Sale was

mailed, via certified mail, to the Debtors and other parties with interests in the Property

on September 12, 2008.

### D.   *Debtors filed for bankruptcy protection to prevent foreclosure*

17.   Desperate to prevent foreclosure, on October 7, 2008 (the "Petition

Date"), within a half hour of the scheduled foreclosure, Debtors each filed their separate

Voluntary Petitions seeking protection from creditors pursuant to Chapter 11 of Title 11,

United States Code ("Bankruptcy Code" or "Code").  The Debtors' jointly administered

bankruptcy cases are each single asset real estate cases as defined by 11 U.S.C. §

101(51B), and thus, the 90 day automatic stay period, pursuant to Section 362(d)(3) of

the Code, expires on January 7, 2008.

18.   Prior to the Petition date, Debtors were two mortgage payments behind.

As of the Petition Date, the total loan obligation Debtors owed Legg Mason was in the

aggregate amount of $11,404,065.88, which is due and payable under the Note and other

Loan Documents.  Such amount consists of the sum of (a) principal in the amount of

$11,000,000, (b) accrued and unpaid interest in the amount of $208,847.22, (c) accrued

Exit Fee of $94,285.71, (d) unpaid late charges in the amount of $46,631.91, and (e) legal

fees of $54,301.04.  However, Legg Mason recognizes that it is currently holding various

amounts in escrows/reserves for the Debtors' benefit as follows:  (a) TILC Reserve in the

amount of $108,269.31, (b) Replacement Reserve Application in that amount of

$10,403.84, (c) Interest Reserve Application in the amount of $238.83 and Tax Escrow

Balance in the amount of $143,876.68.  Additionally, Legg Mason expects to collect on behalf of the Debtors additional insurance proceeds in that amount of $1,269,298.00 in connection with property damage sustained from Hurricane Ike.  If such amounts are offset against the total loan obligations owed, the total loan obligation owed to Debtors as of the Petition Date is reduced to $9,871,979.22.  As of the date of the filing of this Motion, Debtors have made one mortgage payment but remain three mortgage payments behind—two pre-petition mortgage payments and one (but soon to be two) post-petition mortgage payment.

19.     Debtors each filed schedules, as amended, in their respective bankruptcies representing the value of the Property as $15,151,000.

20.     The Meeting of Creditors, required by Section 341 of the Code, was held on November 13, 2008 (the "341 Meeting").  At such meeting, Debtors stated on the record that the Debtors' intention for reorganization was to procure a loan that would replace the current Note held by Legg Mason.  *See* Transcript of 341 Meeting of Creditors at 9:56-10:10 and 14:25-14:45 (Nov. 13, 2008) (CD).  Futhermore, the Debtors stated on the record at the 341 meeting that as of the date of the 341 Meeting, the Debtors valued the Property at $15,000,000, and the Property would be valued at $18 million after repairs and after leasing was brought up to standard levels.  *See* Transcript of 341 Meeting of Creditors at 10:57-11:06 (Nov. 13, 2008) (CD).  A copy of the compact disc of the 341 Meeting will be provided to the Court under separate cover letter, however, for the Court's convenience, a copy of certain relevant excerpts is attached as **Exhibit 1** to the Declaration of Briana L. Cioni attached hereto as **Exhibit B**.

21.     Debtors and Legg Mason entered into an agreed cash collateral order, which was entered by this Court on November 10, 2008.  The cash collateral order provided, among other things, that the Debtors would provide monthly budgetary reports to Legg Mason and Debtors would make monthly payments to Legg Mason's tax and insurance escrow account(s) for any and all post-petition taxes, assessments and governmental charges as required under the Loan Documents, beginning December, 2008.  The cash collateral order further provided that the failure to comply with the terms, conditions or covenants contained in the order would constitute a default under the order and, subject to certain notice requirements, result in termination of Debtors' use of cash collateral.  As of the date of the filing of this Motion, Debtors have not yet provided Legg Mason with a monthly budgetary report leaving Legg Mason in the dark as to whether Debtors have even managed to stay within their budgetary constraints or are in default of the Cash Collateral Order.

22.     Post-bankruptcy, Legg Mason hired an appraiser to conduct an appraisal of the Property (the "Appraisal").  The Appraisal is attached as **Exhibits 1-3** to the Declaration of Brad Kangieser attached hereto as **Exhibit C**.  The Appraisal reveals that the "as is" Market Value of the Property, as of November 10, 2008, is $8,700,000.  Consequently, the Property appears to be diminishing in value and Legg Mason appears to now be undersecured.

## **REQUEST FOR RELIEF**

23.     The stay should be terminated to allow Legg Mason to foreclose on the Property due to the Debtors' lack of any equity in the Property.  Given the current value of the Property, there is no reasonable likelihood that a Plan will be confirmed within the

timeframe established under the Bankruptcy Code, or that a confirmable Plan will even

be filed in the 90 day period (which expires on January 7, 2008) allotted for single asset

real estate bankruptcy cases pursuant to section 362(d)(3) of the Code.  Furthermore, as

the Property is diminishing in value, Legg Mason respectfully requests that this Court

terminate the automatic stay to avoid further erosion of its collateral.

## ARGUMENTS AND AUTHORITIES

A.     *The automatic stay should be terminated pursuant to § 362(d)(2) as Debtors lack equity in the Property and there is no reasonable likelihood that a Plan will be confirmed*

24.     The automatic stay should be terminated to allow Legg Mason to non-

judicially foreclose on its collateral pursuant to 11 U.S.C. § 362(d)(2) because the

Debtors do not have equity in the Property and the assets are not necessary for an

effective reorganization.  As the Supreme Court held in *United Savings Assoc. of Texas v.*

*Timbers of Inwood Forest Associates, Ltd*, "[o]nce the movant under § 362(d)(2)

establishes that he is an undersecured creditor, it is the burden of the *debtor* to establish

that the collateral at issue is necessary to an effective reorganization."  484 U.S. 365, 375

(1988) (internal quotations and citations omitted) (emphasis in original).  Additionally,

the Supreme Court in *Timbers* stated that for an asset to be necessary to an effective

reorganization, "this means … that there must be a reasonable possibility of a successful

reorganization within a reasonable time."  *Id*. at 376.  In other words, if there is not a

reasonable possibility that the debtor will be able to successfully reorganize within a

reasonable time, then the property in question is not necessary to an effective

reorganization under section 362(d)(2)(B).  *Timbers*, 484 U.S. at 376.

25.     Further, "Courts usually require the debtor to do more than manifest unsubstantiated hopes for a successful reorganization." *Canal Place LP v. Aetna Life Insurance Co.*, 921 F.2d 569, 577 (5th Cir. 1991).  Without a reasonable possibility of an effective reorganization, the assets of the estate should not be depleted chasing "terminal euphoria." *Matter of Little Creek Dev. Co.*, 779 F.2d 1068, 1073 (5th Cir. 1986).  Legg Mason should not have to bear the burden of excessive administrative costs in a bankruptcy case where there is no reasonable likelihood that a plan will be confirmed. *See In re Canal Place*, 921 F.2d at 577 (wherein the Fifth Circuit notes that the key to avoiding excessive administrative costs, which are borne by the unsecured creditors, as well as excessive interest expenses, which are borne by all creditors, is early and stringent judicial management of the case.)

26.     An Appraisal of the Property was conducted post-petition on November 10, 2008.  The Appraisal indicates that the "as is" Market Value of the Property is $8,700,000.  The total loan obligations owed as of the Petition Date <u>after</u> offsetting all amounts currently held in escrow/reserve by Legg Mason for the Debtors' benefit <u>and</u> taking into account the anticipated insurance proceeds payment in connection with Hurricane Ike is $9,871,979.22.  Thus, Legg Mason is clearly undersecured at this time.

27.     As evidenced in the Debtors' schedules and as noted at the 341 Meeting, Legg Mason is the largest secured creditor in these single asset real estate cases. Moreover, in light of the recent Appraisal, Legg Mason is also the largest unsecured creditor in these cases, as Debtors' amended schedules reveal unsecured claims, excluding any deficiency claim held by Legg Mason, in the aggregate amount of

$163,655.96.[1]  The Supreme Court has suggested that in the case of an undersecured

creditor, the remedy available in the event that the debtor cannot show that it can

successfully propose a plan within a reasonable period of time is relief from the

automatic stay under section 362(d)(2).  *See* COLLIER REAL ESTATE TRANSACTIONS AND

THE BANKRUPTCY CODE 2-133 (Alan N. Resnick, *et al.* eds., LexisNexis 2007) (*citing*

*United Savings Assoc. of Texas v. Timbers of Inwood Forest Associates, Ltd*,  484 U.S.

365, 375 (1988)).

    28.    Debtors at both the 341 Meeting as well as at the case Status Conference

held by this Court on November 17, 2008, admitted that they intended to reorganize by

procuring a loan to replace the financing currently in place with Legg Mason.  *See*

Transcript of 341 Meeting of Creditors at 9:56-10:10 and 14:25-14:45 (Nov. 13, 2008)

(CD).  Given the fact that the most current Appraisal reveals that the market value of the

Property is $2,300,000 below the principal amount of the secured Note, one cannot

reasonably conclude that the Debtors' will be able to obtain such financing – especially in

light of the current economic climate.[2]  Accordingly, Debtors' ability to reorganize is

nothing more than fantasy.  "The mere possibility of a reorganization 'does not amount to

proof that an effective reorganization is likely in the near future.'"  *In re Powers Aero*

*Marine Services, Inc.*, 42 B.R. 540, 546 (Bankr. S.D. Tex. 1984) (*citing In re Boca*

*Development Assoc.*, 21 B.R. 624, 628 (Bankr. S.D.N.Y. 1982)).

---

[1] The total aggregate amount of unsecured claims listed on Debtors' amended schedules actually reveals general unsecured debt in the amount of $497,155.96.  However, Solar Verde is listed on such schedule F as possessing a claim in the total aggregate amount of $333,500.  Such claim of Solar Verde has since been satisfied by Debtors in full.

[2] Indeed, the most recent Letter of Proposal that Legg Mason has seen from Debtors—which was prepared post-petition on October 31, 2008 by Debtors' intended mortgage broker in connection with procuring a HUD loan on behalf of Debrors as premanent replacement financing—is based on an estimated value of the Property of $16,000,000.00.

29.     Furthermore, Debtors will not be able to confirm a Plan of Reorganization without the necessary support of Legg Mason—the Debtors' largest secured and unsecured creditor.  Because Legg Mason is likely to be impaired and in any Plan proposed by Debtors and Legg Mason will not vote in favor of such a Plan, there will be no accepting, impaired class of creditors.[3]  Therefore, Debtors will be unable to satisfy the requirements of section 1129(a) of the Bankruptcy Code, which are necessary to confirm a plan.

30.     Furthermore, without an impaired class of claims accepting the plan, the Debtors cannot effectuate a "cram down" of a Plan on Legg Mason pursuant to section 1129(b) of the Code[4].  *See In re Meadow Glen, Ltd.*, 87 B.R. 421, 427 (Bankr. W.D. Tex. 1988) ("These debtors have no equity and cannot, over the objections of the deficiency claims of the primary lender, confirm a plan.  This means that no effective reorganization is possible.").  Therefore, because the Debtors have no reasonable prospect of confirming a plan of reorganization, the Property is not necessary to an effective reorganization under section 362(d)(2)(B), and this Court should lift the automatic stay to permit Legg Mason to non-judicially foreclose on the Property rather than prolong the inevitable with Legg Mason bearing the burden of such administrative costs.  *See also In re N.W.*

---

[3] Debtors will not be able to separately classify Legg Mason's unsecured deficiency claim from other general unsecured claims.  *See Phoenix Mutual Life Insurance Co. v. Greystone III Joint Venture*, 995 F.2d 1274 (5th Cir. 1992) (holding that the Debtor's classification scheme, which effectively disenfranchised the creditor's Code-created deficiency claim, is sanctioned neither by the Code nor by case law); *see also In re B&B West 164th Street Corp.*, 147 B.R. 832, 839 (Bankr. E.D.N.Y.) ("Where the unsecured deficiency claim of a lender dominates the unsecured class, it is wrong to separately classify the unsecured deficiency claim."); *In re Meadow Glen, Ltd.*, 87 B.R. 421 (Bankr. W.D. Tex. 1988) (when general unsecured and deficiency claims are split, the voice given the deficiency is improperly taken away); *John Hancock Mutual Life Insurance Co. v. Route 37 Business Park Assoc.*, 987 F.2d 154, 160 (3d Cir. 1993) ("Concluding that the debtor had failed to offer any proper explanation for splitting up the unsecured claims, the court held that the classification scheme was 'clearly for the purpose of manipulating voting and it may not stand.'") (*citing In re Bryson Properties*, XVIII, 961 F.2d 496, 502 (4th Cir. 1992)).

[4] Similarly, Legg Mason cannot conceive of how Debtors' can propose a plan that will satisfy the asbolute priority rule to attempt to maintain equity in the Property.

*Timberline Enters.*, 348 B.R. 412, 430 (Bankr. N.D. Tex. 2006) (finding the debtors' sole substantive assets – two gas stations – were "not necessary for an effective reorganization" where the debtors had no prospect of successfully confirming a plan, and lifting the automatic stay to allow the secured creditor to foreclose).

**B.**     ***The automatic stay should be terminated "for cause" pursuant to § 362(d)(1)***

      **i.**     **The value of Legg Mason's collateral is decreasing**

31.     Section 362(d)(1) of the Code states that the court shall grant relief from the stay "for cause, including the lack of adequate protection of an interest in property of such party in interest…."  11 U.S.C. § 362(d)(1).  Thus, the stay should be lifted to allow Legg Mason to non-judicially foreclose on the Property as its collateral continues to decrease in value.

32.     The Debtors' scheduled the value of the Property at $15,151,000  which, upon information and belief, is based on an appraisal conducted by Debtors in August 2008.  As Legg Mason's appraisal, dated November 10, 2008, reveals an "as-is" Market Value of $8,700,000, the Property has clearly decreased in value significantly—perhaps by as much as 42% ($6,300,000) in three months, indicating that the collateral has decreased in value since the petition date.  Moreover, given the current economic climate, Legg Mason has reason to believe that the Property will continue to decrease in value.  Therefore, termination of the automatic stay is absolutely critical to avoid further erosion of Legg Mason's collateral.

      **ii.**     **Debtors' petitions were filed in less than "good faith"**

33.     Under certain conditions, the filing, or continuing, of a bankruptcy case may be improper.  "Numerous cases have found a lack of good faith to constitute 'cause'

for lifting the stay to permit foreclosure or for dismissing the case." *Matter of Little Creek Dev. Co.*, 779 F.2d 1068, 1072 (5th Cir. 1986). Determination of whether or not a debtor's bankruptcy petition was filed in "good faith" will depend largely upon the bankruptcy court's "on-the- spot evaluation of the debtor's financial condition, motives, and the local financial realities." *Id.* The Fifth Circuit has articulated a list of non-exclusive conditions that often exist when a debtor's filing lacks "good faith", which include the following: (1) the debtor has one asset; (2) the debtor's asset is encumbered by secured creditors' liens; (3) the debtor has few or no employees; (4) the debtor has little or no cash flow; (5) the debtor has no available sources of income with which to sustain a plan of reorganization or make adequate protection payments; (6) the debtor will typically have few, if any, unsecured creditors whose claims are comparatively small; and (7) the debtor's property has often been posted to foreclosure because of arrearages on its debt to its secured creditor(s). *Id.* at 1073. When some or all of these conditions are present, bankruptcy courts have found that resorting to the protection of bankruptcy is improper because there is no going concern to protect, nor any hope of rehabilitation, and "neither the bankruptcy courts nor the creditors should be subjected to the costs and delays of a bankruptcy proceeding under such conditions." *Id.* Furthermore, some bankruptcy courts have conducted an "objective futility inquiry ... designed to insure that there is embodied in the petition 'some relation to the statutory objective of resuscitating a financially troubled debtor.'" *In re Henderson*, 395 B.R. 893, 904 (Bankr. D.S.C. 2008) (internal citations omitted).

34.     Here, the Debtors each have a single asset which is completely encumbered by Legg Mason's liens, and the Debtors' bankruptcy filings were for the

purpose of preventing foreclosure.[5]   Indeed, the Debtors' representative at the 341

Meeting stated unequivocally that "[t]he reason [the Debtors] filed bankruptcy was to

stop the foreclosure when [they] were not able to make some of the payments."  *See*

Transcript of 341 Meeting of Creditors at 9:56-10:10 and 4:21-4:34 (Nov. 13, 2008)

(CD).  Additionally, the Debtors have few employees, and their only sources of cash flow

are the rent collectables,[6] which are the subject of the cash collateral order entered in this

case pursuant to the Debtors' Assignment of Rents to Legg Mason.  Further, the Debtors

have very few unsecured creditors, and, as discussed above, their claims in the aggregate

amount to far less than the unsecured deficiency claim of Legg Mason.

      35.     Thus, many of the non-exclusive conditions articulated by the Fifth Circuit

in the *Little Creek* case are now present in these cases.  Therefore, an "on-the-spot"

evaluation of these Debtors' financial conditions, motives, and the local financial

conditions reveals that Debtors, even if they originally filed the bankruptcy petitions in

"good faith" to prevent a foreclosure and to preserve their equity in the Property, cannot

continue these bankruptcy proceedings in "good faith" because: (1) the petitions were

filed to arrest impending foreclosures by Legg Mason, (2) Legg Mason (the secured

creditor) is woefully undersecured, (3) these bankruptcy cases exist merely because of

this two-party dispute between Legg Mason and the Debtors, and (4) there is no longer

---

[5] While the Debtors may have believed they had equity in the Property to preserve at the time of the anticipated foreclosure thus prompting the bankruptcy filings, it is now clear that the Debtors lack any equity in the Property, and it would be Debtors' bad faith to continue such bankruptcy proceedings.

[6] One fact suggesting the limited nature of the Debtors' cash flow is that the Debtors have largely been unable to make timely payments on their obligations to Legg Mason under the Note.  The Debtors have thus far made a total 18 payments to Legg Mason, and only five of those payments were within the eight-day grace period following the payment due date; all others were late.  *See* Exhibit 10 to the Sellers Declaration.  Further, the Debtors' payments to Legg Mason are for the previous month, while the Debtors collect rents in advance, which suggests that the Debtors' rent collectables are either inadequate to meet their obligations under the Note, or their cash flow is not being appropriately managed.

any hope of successfully reorganizing the Debtors.   Thus, the Debtors' bankruptcy cases currently meet a majority of the Fifth Circuit's *Little Creek's* factors, which justifies lifting the stay.

> **iii.    Debtors' cases are objectively futile**

36.    Furthermore, this case is clearly objectively futile as there is no equity cushion in the Property, so any sale or refinancing of the Property would not pay creditors in full.  *In re Henderson,* 395 B.R. at 904 (finding debtor's case to be objectively futile due to no equity cushion in the single asset of the estate so any sale or refinancing of the property would not pay creditors in full); *see also In re Woodbranch Energy Plaza One, Ltd.*, 44 B.R. 733, 737 (Bankr. S.D. Tex. 1984) (finding the stay should be lifted for "cause" specifically including a lack of adequate protection where the "'equity cushion' … would be devoured totally in less than one year by the accruing interest alone, not to mention the accumulation of other fixed costs, taxes, and depreciation."); *see also In re Mendoza,* 111 F.3d 1264,1272 (5th Cir. 1997) ("Case law has almost uniformly held that an equity cushion of 20% or more constitutes adequate protection.").  Accordingly, "cause" exists for lifting the stay to permit Legg Mason to non-judicially foreclose on its collateral.

### iv.    Debtors have made virtually no progress in their allotted ninety-day period to reorganize

37.    Under section 362(d)(3) of the Bankruptcy Code[7], a secured creditor of a single asset real estate debtor is entitled to relief from the automatic stay if, within 90 days following the commencement of the case, the debtor has either not filed a plan of reorganization that has a reasonable probability of being confirmed, or the debtor has failed to commence making interest payments to the secured creditor.  Noting that single asset real estate cases had historically been filed to avoid a foreclosure and with the unrealistic hope that the debtor would be able to come up with some form of "miracle" to formulate a plan of reorganization, Congress intended that this 90-day requirement would "ensure that the automatic stay provision is not abused, while giving the debtor the opportunity to create a workable plan of reorganization."  *In re LDN Corp. (Nationsbank, N.A. v. LDN Corp.)*, 191 B.R. 320, 326 (Bankr. E.D. Va. 1996) (citing S. Rep. No. 168, 103rd Cong., 1st Sess. (1993)).  The language of section 362(d)(3) thus evidences Congress' intent to give secured creditors "quick relief in a single asset case when the

---

[7] 11 U.S.C. § 362(d)(3) in its entirety reads as follows:

[W]ith respect to a stay of an act against single asset real estate under subsection (a), by a creditor whose claim is secured by an interest in such real estate, unless, not later than the date that is 90 days after the entry of the order for relief (or such later date as the court may determine for cause by order entered within that 90-day period) or 30 days after the court determines that the debtor is subject to this paragraph, whichever is later--

(A) the debtor has filed a plan of reorganization that has a reasonable possibility of being confirmed within a reasonable time; or

(B) the debtor has commenced monthly payments that--

(i) may, in the debtor's sole discretion, notwithstanding section 363(c)(2), be made from rents or other income generated before, on, or after the date of the commencement of the case by or from the property to each creditor whose claim is secured by such real estate (other than a claim secured by a judgment lien or by an unmatured statutory lien); and

(ii) are in an amount equal to interest at the then applicable nondefault contract rate of interest on the value of the creditor's interest in the real estate

debtor fails to promptly file a plan or make early interest payments to the creditor secured by the real estate." *Id.* at 327.   Thus, Congress desired to give single asset real estate debtors the opportunity to prove that their foray into bankruptcy is not merely an attempt to forestall foreclosure, and that they have the wherewithal to successfully reorganize.

38.    The statute intends that single asset real estate debtors move quickly and efficiently toward reorganization.  Otherwise, such debtors could languish indefinitely in bankruptcy at the expense of their secured lenders, which is expressly what Congress sought to prevent.

39.    The Debtors in these cases, however, have not moved quickly and efficiently towards formulating a realistic plan of reorganization within their allotted 90 days.  In fact, the Debtors have allowed the sun to set on this critical 90-day period without making any discernable progress toward reorganizing.  For instance, at the 341 Meeting when questioned by the United States Trustee regarding the timeline for hiring professionals, Debtors' counsel responded on behalf of Debtors that necessary professionals (which included the broker) would be retained within 30 days, if not sooner.[8]  Approximately 55 days have now elapsed, and the Debtors have yet to hire the broker whose role is critical to the Debtors' ability to secure new financing and propose a confirmable plan of reorganization.  This is exactly the sort of delay that Congress sought to protect secured lenders from in single asset cases when it created the 90 day deadline under section 362(d)(3).  Further, even if Debtors commence making "interest payments" pursuant to § 362(d)(3)(B), the automatic stay should still be lifted because, as explained in detail above, the Debtors have no realistic chance of successfully confirming a plan of

---

[8] *See* Transcript from 341 Meeting at 17:05-17:13: U.S. Trustee, Q: "All three of those professionals will be hired in the next 30 days?"  Cousel for Debtors, A: "Yes, I'd be surprised if we didn't beat that."

reorganization.  It is not conceivable that Congress intended to allow a single asset debtor to linger in bankruptcy indefinitely by simply making monthly "interest payments" when there is no realistic prospects for reorganization.[9]

40.     Debtors in these cases have made very little progress towards reorganizing as evidenced by the fact that they have not even formally hired a broker let alone obtained a binding lending commitment on the eve of their 90 day period.  Moreover, the prospect for obtaining a binding lending commitment is mere fantasy at this juncture given the current value of the Property and the fact that the Debtors will not be able to confirm any Plan of Reorganization given Legg Mason's general unsecured status.  Thus, these single asset bankruptcy cases are objectively futile.  Legg Mason has cooperated with the Debtors and has patiently waited while the Debtors attempted to reorganize.  However, the time has come to bring down the curtain on the Debtors failed attempt to even begin a realistic reorganization.  Accordingly, the stay should be lifted to allow Legg Mason to exercise its right to non-judicially foreclose on its collateral.

WHEREFORE, Legg Mason respectfully requests that this Court enter an order (i) lifting the automatic stay so as to allow Legg Mason to non-judicially foreclose on the

---

[9] This idea is evidenced by the fact that at least one court has found that upon expiration of the 90 day period, a debtor must be able to demonstrate that it can provide "a concrete substitute for the creditor's statutorily-fixed expectation of payment, if the debtor is to be so excused."  *In re Heather Apartments, L.P.*, 366 B.R. 45, 50 (Bankr. D. Minn. 2007).  The debtor bears a "heavy burden of production" that a proposed sale or refinancing of the property is likely to close, and that such sale will provide enough proceeds to meet the requirements of the statute in order to be granted an extension of time beyond the 90 day period. *Id.*  The *Heather Apartments* Court futher explained that this proof should consist of, at a minimum:

> [A] binding purchase agreement executed before the presentation of the motion [for an extension] under § 362(d)(3); a binding lending commitment in favor of the prospective purchaser; and demonstrated substantial progress in satisfying the ministerial minutiae for closing.  Only then could a court feel assured that the protected mortgagee would receive a substantial equivalent of its expectancy under § 362(d)(3), so as to merit holding it off from foreclosure after the first 90 days of the case.

*Id.*

Property and pursue such other rights and remedies that it may have under the Loan

Documents and applicable law; and (ii) granting such other and further relief as may be

just and proper.

      Respectfully submitted on this 6th day of January 2009.


**STUTZMAN, BROMBERG,**
**ESSERMAN & PLIFKA,**
A Professional Corporation

By:  */s/ Briana L. Cioni*

Peter C. D'Apice
State Bar No. 05377783
Jacob L. Newton
State Bar No. 24046523
Briana L. Cioni
State Bar No. 24044161

2323 Bryan Street, Suite 2200
Dallas, TX 75201-2689
Telephone:  (214) 969-4900
Fax: (214) 969-4999

**Counsel for LMREC CDO II REO I, Inc.**

## <u>CERTIFICATE OF CONFERENCE</u>

On the 5th day of January, 2009, I contacted Marjorie Britt and Michael Catrett vie telephone to confer regarding Legg Mason's request for the lifting of the automatic stay and if Debtors would consent thereto.  Debtors informed me that they oppose such request.

/s/Briana L. Cioni
Briana L. Cioni
(TX Bar No. 05377783)

Stutzman, Bromberg, Esserman & Plifka,
A Professional Corporation
2323 Bryan Street, Suite 2200
Dallas, Texas  75201

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that a true and correct copy of the foregoing document with exhibits was served upon all persons listed below via ECF and/or first class mail, postage prepaid on the 6th day of January 2009.  Due to the voluminous amount of exhibits, a true and correct copy of the document, without exhibits, was served on all parties listed on the attached service list via first class mail, postage prepaid on the 6th day of January 2009.  Any party may contact Briana L. Cioni, counsel for Legg Mason, to request a copy of the exhibits.

Marjorie Payne Britt
Michael Catrett
Britt & Catrett, P.C.
4615 Southwest Freeway, Suite 500
Houston, TX  77027

Greens 126 LP
Oaks 198 LP
Trails 240 LP
8045 Antoine Drive #189
Houston, TX 77088

Christine A March
Office of the US Trustee
515 Rusk St
Ste 3516
Houston, TX 77002


_/s/ Briana L. Cioni_____
Briana L. Cioni