# UNITED STATES BANKRUPTCY COURT

## SOUTHERN DISTRICT OF TEXAS

### HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE | § | |
| | § | |
| Greens 126, L.P. and | § | No.  08-36470 |
| Oaks 198, L.P. and | § | No. 08-36471 |
| Trails 240, L.P. | § | No. 08-36472 |
| | § | JOINTLY ADMINISTERED |
| Debtors. | § | UNDER NO. 08-36470 |

**DEBTORS' DISCLOSURE STATEMENT IN THE BANKRUPTCY CASE OF GREENS 126, L.P., OAKS 198 L.P. AND TRAILS 240, L.P. <u>DATED JULY 28, 2009</u>**

### *Table of Contents*

I.  **INTRODUCTION**
    A.  **Purpose of This Document**
    B.  **Deadlines for Voting and Objecting;  Date of Plan Confirmation Hearing**
        1.  Time and Place of the Hearing to Approve This Disclosure Statement and Confirm The Plans
        2.  Deadlines For Voting For or Against the Plans
        3.  Deadline for Objecting to the Adequacy of Disclosure Statement and Confirmation of the Plans
        4.  Identity of Person to Contact for More Information

II.  **BACKGROUND**
    A.  **Description and History of the Debtors' Business**
    B.  **Insiders and Affiliates of the Debtors**
    C.  **Management of the Debtors Before and During the Bankruptcy**
    D.  **Events Leading to Chapter 11**
    E.  **Significant Events During the Bankruptcy**
    F.  **Projected Recovery of Preferential or Fraudulent Transfer**
    G.  **Claims Objections**
    H.  **Current and Historical Financial Conditions**

III.  **SUMMARY OF THE PLANS OF REORGANIZATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS**
    A.  **What is the Purpose of the Plan of Reorganization**
    B.  **Classified Claims and Interests**
        1.  Class 1:  Allowed Administrative Claims or Expenses

    2.        Class 2:  Allowed Priority Wage Claims
    3.        Class 3:  Priority and Secured Tax Claims
    4.        Class 4:  Allowed or Secured Claims
    5.        Class 5:  Allowed Small General Unsecured Claims
    6.        Class 6:  Allowed General Unsecured Claims
    7.        Class 7:  Equity Interest Holders

**C.**    **Means of Implementing the Plans**
    1.        Sources of Payments and General Provisions
    2.        Vesting of Assets
    3.        Post-confirmation Management
    4.        Distribution of Consideration
        (a)      Dates of Distribution
        (b)      Disbursing Agent, Duties and Compensation

**D.**    **Risk Factors**
**E.**    **Executory Contracts and Unexpired Leases**
**F.**    **Tax Consequences of Plans**

**IV.**    **CONFIRMATION REQUIREMENTS AND PROCEDURES**
**A.**    **Who May Vote or Object**
    1.        What Is An Allowed Claim or an Allowed Interest
    2.        What is an Impaired Claim or Impaired Interest
    3.        Who is Not Entitled To Vote
    4.        Who Can Vote in More Than One Class

**B.**    **Votes Necessary to Confirm the Plan**
    1.        Votes Necessary for a Class To Accept the Plan
    2.        Treatment of Non-accepting Classes

**C.**    **Liquidation Analysis**
**D.**    **Feasibility**
    1.        Ability to Initially Fund Plan
    2.        Ability to Make Future Payments and Operate Without Further
            Reorganization

**V.**    **EFFECT OF CONFIRMATION OF PLAN**
**A.**    **Discharge of Debtors**
**B.**    **Modification of Plan**
**C.**    **Final Decree**

## I.    INTRODUCTION

This is the consolidated disclosure statement ("Disclosure Statement") in the chapter 11 cases of Greens 126, L.P., Oaks 198, L.P. and Trails 240, L.P.  (jointly as "Debtors" and individually as "Greeens", "Oaks", "Trails", respectively), filed by Debtors, in the above styled and numbered bankruptcy case.  Even though Debtors have filed a consolidated Disclosure Statement, each individual Debtor has a specific plan of reorganization ("Plan") that determines the specific treatment of the claims in the Debtors' specific case.  References to Plans in this document refers generally to the plans of reorganization filed by the individual Debtors.

The bankruptcy cases were filed individually but are jointly administered under the Greens's case number by order of the Bankruptcy Court. This Disclosure Statement was prepared based on information provided by the Debtors, and to the extent that information is disclosed in this Disclosure Statement, Debtors believe the information to be true and correct to the best of their knowledge.   This Disclosure Statement contains information about the Debtors and describes the separate Plans of Reorganization Dated July 28, 2009 ("Plan") filed by each of the Debtors.   A full copy of the each Plan is attached to this Disclosure Statement as Exhibits "1", "2" and "3".   Although this Disclosure Statement discusses and outlines the provisions of the Plans, to the extent that a specific Plan may detail treatment of claims and interests or otherwise provide alternate provisions, and to the extent that this Disclosure Statement may not be consistent with the provisions in a specific Plan, it is the specific Plan that controls, not this Disclosure Statement.  ***Your rights may be affected.  You should read the Plans and this Disclosure Statement carefully and discuss them with your attorney.  If you do not have an attorney, you may wish to consult one.***

### A.    Purpose of This Document

This Disclosure Statement describes:

- The Debtors, their history, and significant events during the bankruptcy case,
- How the individual Plan of each Debtor proposes to treat claims or equity interests of the type you may hold (*i.e.*, what you will receive on your claim or equity interest if the plan is confirmed),
- Who can vote on or object to the Plans,
- What factors the Bankruptcy Court (the "Court") will consider when deciding whether to confirm the Plans,
- Why the Debtors believe the  Plans are feasible, and how the treatment of your claim or equity interest under the Plans compares to what you would receive on your claim or equity interest in liquidation, and
- The effect of confirmation of the Plans.

Be sure to read the Plans as well as the Disclosure Statement.  This Disclosure Statement describes the Plans, but it is the Plans themselves that will, if confirmed, establish your rights.

**B.      Deadlines for Voting and Objecting; Date of Plan Confirmation Hearings**

The Court has not yet confirmed the Plans described in this Disclosure Statement.  This section describes the procedures pursuant to which the Plans will or will not be confirmed.

### 1.      Time and Place of the Hearing to Approve This Disclosure Statement and Confirm the Plans

The hearing at which the Court will determine whether to confirm the Plans will take place on _____, at _____ __.m., before the Honorable Karen K Brown, Bob Casey United States Courthouse, Courtroom 401, 515 Rusk, Houston, Texas 77002.

### 2.      Deadline For Voting For or Against the Plans

If you are entitled to vote to accept or reject the plan, vote on the enclosed ballot and return the ballot in the enclosed envelope to Michael Louis Catrett, Esq., Britt and Catrett, P.C,, 4615 Southwest Freeway, Suite 500, Houston, Texas 77027.  See section III-A. below for a discussion of voting eligibility requirements.

Your ballot must be received by _____ or it will not be counted.

### 3.      Deadline For Objecting to the Adequacy of Disclosure and Confirmation of the Plan

Objections to this Disclosure Statement or to the confirmation of the Plan must be filed with the Court and served upon Michael Louis Catrett, Esq., Britt and Catrett, P.C., 4615 Southwest Freeway, Suite 500, Houston, Texas 77027 by _____, 2009.

### 4.      Identity of Person to Contact for More Information

If you want additional information about the Plan, you should contact Marjorie Payne Britt, Esq. or  Michael Louis Catrett, Esq., Britt and Catrett, P.C., 4615 Southwest Freeway, Suite 500, Houston, Texas 77027 (tel.  713-666-0807, fax 713-355-8382).


## II.      BACKGROUND

### A,      Description and History of the Debtors' Business

The Debtors are each a Texas limited partnership. Each Debtor holds as its primary asset, a single apartment complex, plus miscellaneous items of personal property as detailed in the Debtors' individual Schedules B.  The approximate number of apartments in each complex as indicated by the numerical designation in the individual Debtor's name. The consolidated statistics on the properties is below:

Trails of Inwood Apartments          240 Units
5300 West Gulf Bank
Houston, TX 77088

| | |
|---|---|
| Oaks of Inwood Apartments<br>5300 West Gulf Bank<br>Houston, TX 77088 | 198 Units |
| Inwood Greens Apartments<br>5300 West Gulf Bank<br>Houston, TX 77088 | 126 Units |
| Total Units | 564 |
| Building S.F. | 443,148 |
| No. of Buildings | 51 |
| Land Acres | 31.60 |
| Year Built | 1981-1982 |
| Roof Type | Pitched Roof Composition shingles |
| Washer/Dryer | Hook-ups |
| No. of Stories | Two |
| No. of Parking Spaces | 811 |
| No. of Outdoor Pools | Three |

The consolidated properties consist of three contiguous, but individually parceled, 2 story low-density garden style properties, operated as one community. The total number of units are 564 affordable apartment homes: Inwood Greens 126 units, Trails of Inwoods 240 units, and The Oaks of Inwoods 190 units. The Oaks of Inwoods contains the leasing and managers office. The floor plans are exceptional and very spacious with the majority of units being 2 bedrooms. All of the homes have dishwashers, balconies or patios and washer/dryers utility rooms in the 2 bedrooms.

The properties were constructed in 1981-1982 and are nearly identical in construction characteristics being two story frame constructions with brick veneer and pitched composition asphalt shingles. The apartment homes are all individually metered for utilities, with copper plumbing and copper wiring and serviced by individual central HVAC units. Other amenities include controlled access gates, patio/balconies, washer/dryer connections, fireplace, ceiling fans, mini-blinds, and cable TV connections. The complexes are a short 10-15 minute drive to George Bush International Airport, downtown Houston, The Galleria District and Greenway Plaza. The combined properties occupy over 31 acres with nearly a quarter of a mile of frontage on West Gulf Bank Road. They are within several blocks of the regional shopping centers, parks, and within walking distance to the 9th grade and high schools and local strip malls.

The Properties were purchased out of foreclosure by the current owners on or about January, 2006, for approximately $7,000,000. At the time of purchase, many of the apartments were boarded up with broken windows, damaged sheetrock, stolen copper piping, stripped heating and cooling systems and numerous other items that one would normally see in an abandoned, neglected property. Since acquisition, the properties have undergone major renovations with Owner investments in excess of four million dollars. At the time of purchase, only 62 units were occupied out of the total 564 units (11% occupancy), with income reflective of that level of occupancy. At the time of Hurricane Ike (September 2008), approximately 468 units were occupied (83% occupancy).

The original purchase was financed by Avatar Financial, and then refinanced by LMREC CDO II REO I, Inc. ("Legg Mason") inJanuary, 2007.  Legg Mason holds an extensive security interest in the properties, including but not limited to real and personal property, rents, accounts receivable and proceeds from insurance distributions (see Exhibit "9").

In February 2007, 6 units in the Trails of Inwood property were severely damages by fire, resulting in 16 units not being fit for occupancy.  Although some insurance proceeds have been received for repairs, negotiations continue for additional funds.  At this time, repairs to 46 units have been started.

In September 2008, Hurricane Ike hit the Houston area and the three properties incurred significant damages, primarily roof damage and then concurrent damages to the units resulting from roof damages.  Approximately 80 % of the units were either damaged directly or affected by the hurricane.  Additionally, there may be some other damage to the structures resulting from pressure differentials on the structures as the hurricane passed through and is currently being investigated

On October 6, 2008, the three limited partnerships filed for protection under chapter 11 of the United States Bankruptcy Code in the Houston Division of the Southern District of Texas due to pending foreclosure of the properties by Legg Mason.

### B.      Insiders and Affiliates of the Debtors

Each of the three Debtors is a Texas limited partnership.  The partners in each limited partnership are Java Investments, L.L.C. (1% general partner) and Tammi Le (99% limited partner) (collectively "Owner").  To the extent that the Owner of each Debtor is the same, each Debtor has a relationship to the other Debtors, and Debtors share common management and appropriate resources as indicated by prudent property management.  Based on Debtors' current knowledge, there are no other insiders or affiliates of the Debtors except as disclosed here.

### C.      Management of the Debtor Before and During the Bankruptcy

From the time of the purchase of the properties in January, 2006 until approximately November, 2008, the properties were managed by Creative Property Management.   In approximately January 2006, Owner added an onsite representative, Andrew Zel, who is the currently designated Manager of the properties.  Except for a short period in late 2008 and early 2009, Creative Property Management has continued to provide management consulting services to the Debtors.

The Manager of the Debtors during the Debtor's chapter 11 case has been Java Investments, L.L.C and Tammi Le with the designated onsite representative as Andrew Zel.

After the Effective Date of the order confirming the Plans, the directors, officers, and voting trustees of the Debtors, any affiliate of the Debtors participating in a joint Plan with the Debtors, or successor of the Debtors under the Plan (collectively the "Post Confirmation Managers"), will be Java Investments, L.L.C. and Tammi Le with Andrew Zel as the designated onsite representative.

### D.  Events Leading to Chapter 11

Following the refinancing by Legg Mason, the Owners embarked on the significant re-build and re-characterization of the Properties.  This involved not only renovation but close management control in the selection process of new residents as well as a carefully targeted advertising campaign.  However, during this period, cash flow issues were encountered, triggering unanticipated late and other charges under the security agreement.  Although Owners worked diligently with Legg Mason to resolve these, matters escalated to an eventual freezing of the Debtors' accounts as well as the Owner's accounts, making continued ongoing operations virtually impossible.  These cash flow issues then subsequently resulted in the secured lender posting the Properties for foreclosure.

### E.  Significant Events During the Bankruptcy

After the Petition Date, Debtors requested joint administration of the three cases and granted by the Court on 10/08/2008 (Case no. 08-36470, doc. #4; Case no. 08-36471, doc. #4; Case no. 08-36272, doc. #4).   The Debtors employed the law firm of Britt and Catrett, P.C. as bankruptcy counsel, approved per order dated 10/17/2008 (Case no. 08-36270, doc. #13). The Debtors and Legg Mason then entered into an agreed order regarding the use of cash collateral, granted by the Court on 11/10/2008 (Case no. 08-36270, doc,. #30).  Legg Mason subsequently filed a motion to lift the automatic stay on 01/06/2009 (Case no. 08-36470, doc. #47), later resolved by a granted application to compromise controversy (Case no. 08-36470, doc. #77) requiring among other things, a plan and disclosure statement be filed no later than July 31, 2009.  An agreed order also extended the prior cash collateral order (Case no. 08-36470, doc #51). .

Major physical damage was sustained pre-petition by the Properties during Hurricane Ike, primarily roofs.  Debtors immediately had the roofs tarped, and then within the confines of insurance proceeds distributions and the availability of competent contractors, had the roofs fully repaired by the end of March 2009.  Interior repairs are now progressing.  However, the residual effects of the hurricane on the general property appearance has been detrimental in retaining prior occupancy levels as shown by the table below.  With respect to the declining occupancy, it is worth noting that particularly with the general condition of the Houston area following the hurricane, residents may not relocate immediately but rather in later months as alternative housing is found that was either not hurricane affected or already repaird.  Additionally the presence of damaged units affected the marketability of undamaged units in the immediate and surrounding buildings of the Properties.

| CONSOLIDATED UNIT OCCUPANCIES BY MONTH | | | | |
|---|---|---|---|---|
| Month | Greens | Oaks | Trails | Total |
| Nov. 2008 | 100 | 151 | 152 | 403 |
| Dec. 2008 | 99 | 153 | 151 | 403 |
| Jan. 2009 | 100 | 153 | 150 | 403 |
| Feb. 2009 | 85 | 122 | 127 | 334 |
| Mar. 2009 | 84 | 120 | 122 | 326 |
| Apr. 2009 | 86 | 126 | 130 | 342 |
| May 2009 | 85 | 125 | 125 | 335 |
| Jun. 2009 | 79 | 123 | 121 | 323 |

During the bankruptcy, Debtors have entered into four post-petition contracts for services outside the normal course of business.  The first was to enlist the accounting services of Michael Jayson of Jayson & Frisby, P.C. to provide high level accounting and business consulting during the bankruptcy (Case no. 08-36470, doc. #68).  It is anticipated Michael Jayson will continue to provide services to the Debtors on an ongoing basis both in the areas of consulting and as disbursing agent under the proposed Plan. The second contract was for roofing services from Solar Verde (Case no. 08-36470, doc. #73).  This contract is in dispute over payment with both Solar Verde and its supplier, Southern Shingles, filing M&M liens against the properties.  These disputes revolve around payment by the primary contractor to its suppliers and subcontractors. Additionally, the availability of funds to pay for the completion of work is dependent on issuance of checks by the insurance provider.  At the time of this Disclosure Statement, those issues remain unresolved but all parties are working in good faith towards a resolution. The third was to obtain continued consulting services for the management of the properties from Creative Property Management, Inc. (Case no. 08-36470, doc. #74).  The final contact was for public adjuster services from Eric Raisman (Case no. 08-36470, doc. #80).  This contract is also currently in dispute although no litigation to date has been filed by any of the parties.  Debtors' position is the adjuster's performance did not meet the standards imposed by the contract but the amounts in dispute are so small as to not be material to consideration of the feasibility of the Plans.

### F.    Projected Recovery of Preferential or Fraudulent Transfers

To the best of Debtors' knowledge, there were no preferential or fraudulent transfers preceding the filing of the bankruptcy case.

### G.    Claims Objections

Except to the extent that a claim is already allowed pursuant to a final non-appealable order, the Debtor reserves the right to object to claims.  Therefore, even if your claim is allowed for voting purposes, you may not be entitled to a distribution if an objection to your claim is later upheld.  The procedures for resolving disputed claims are set forth in Article IV of the Plan.

## H.      Current and Historical Financial Conditions

Debtors' primary assets consist of the real property described in Exhibit "7", and miscellaneous personal property is described in Schedule B of each Debtor's bankruptcy filings, as well as proceeds from various insurance settlements and claims (currently unvalued), amounts on deposit with Legg Mason in various reserve accounts, accounts receivables, miscellaneous pieces of intellectual property such as logos, names, etc. and unvalued good will (which includes its value as an ongoing business).  The secured lender Legg Mason holds a perfected security interest in all the above with the exception of the good will but more specifically described in Exhibit "9".

At the time of the filing of this Disclosure Statement, Debtors were current on their payments to the secured lender Legg Mason, as required under bankruptcy law.  Debtors are also current on their wages and salaries, tax remittances as required, and payments to post-petition vendors, excluding those associated with the re-roofing project.  As discussed above, vendors associated with the re-roofing of the buildings currently have liens against the property, resulting primarily from the difficulty and delays in processing and receiving insurance settlements as the work has progressed.

Debtors' leasing operation is still recovering from the lingering damage from Hurricane Ike.  However repairs are proceeding and Debtors anticipate increased levels of occupancy approaching those pre-Hurricane by the end of 2Q 2010.  Once occupancy levels are stabilized, Debtors anticipate increased occupancy to the 80% plus level based on the superior condition of the properties compared to those of surrounding complexes.

## III.      SUMMARY OF THE PLANS OF REORGANIZATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS

### A.      What is the Purpose of the Plan of Reorganization?

As required by the Code, the Plans place claims and equity interests in various classes and describes the treatment each class will receive.  The Plan also states whether each class of claims or equity interests is impaired or unimpaired.  If the Plan controlling your specific claim or interest is confirmed, your recovery will be limited to the amount provided by the Plans.

### B.      Classified Claims and Interests

The following are the classes set forth in the Plans, and the proposed treatment they will receive under the Plans.

### 1.    Class 1:  Allowed Administrative Claims or Expenses:

Administrative expenses are costs or expenses of administering the Debtor's chapter 11 case which are allowed under § 507(a)(2) of the Code as well as fees payable to the U.S. Trustee and post-petition debts incurred in the ordinary course of business.  Administrative expenses also include the value of any goods sold to the Debtor in the ordinary course of business and received within 20 days before the date of the bankruptcy petition.   The Code requires that all administrative expenses be paid on the effective date of the Plan, unless a particular claimant agrees to a different treatment.

The following lists the Debtors' estimated administrative expenses, and their proposed treatment under the Plans.  For the purposes of administrative simplicity, the Administrative Claims or Expenses are consolidated for the three Debtors as one claim or expense.

| Class | Holder | Amount | Treatment |
|-------|--------|--------|-----------|
| 1.1 | U.S. Trustee fees | $0.00 | Paid in full as of the Effective Date. |
| 1.2 | Britt & Catrett, P.C. | $50,000 | To the extent not paid during the chapter 11 case, shall be paid in cash on the Effective Date |
| 1.3 | Michael Jayson, CPA | $22,000 | To the extent not paid during the chapter 11 case, shall be paid in cash on the Effective Date |
| 1.4 | Post-petition debts incurred in the ordinary course of business | Unknown | To the extent not paid during during the chapter 11 case, shall be paid on the Effective Date. |

### 2.    Class 2:  Allowed Priority Wage Claims

Priority wage claims are those claims allowed under § 507(a)(4) of the Code, for wages, salaries, commissions and the like, earned by individuals or corporations within 180 days of the filing of the petition, limited to a maximum amount of $10,000.00 for each individual or corporation.   To the best of Debtors' knowledge, there are no priority claims under §§ 507(a)(1), (5), and (6).   Any claims under § 507(a)(7) are provided for outside of the Plan(s) under the agreed cash order with Legg Mason discussed above.

### 3.    Class 3:  Priority and Secured Tax Claims

Priority tax claims are unsecured income, employment, and other taxes described by § 507(a)(8) of the Code.  Unless the holder of such a § 507(a)(8) priority tax claim agrees otherwise, it must receive the present value of such claim, in regular installments paid over a period not exceeding 5 years from the order of relief.  In certain cases, a tax claimant may have a security interest in a debtor's assets either by operation of statute or by filing of a lien.  In that event, a debtor must provide interest to the extent provided by law or by court order to the claimant in the plan.

To the extent Debtors had any pre-petition tax claims, those claims were paid by Legg

Mason in full from escrow payments made by Debtors to various reserve accounts held by Legg Mason.  Debtors will continue to make these escrow payments to Legg Mason under the terms of the contract.

### 4.    Class 4:  Allowed Secured Claims

Allowed Secured Claims are claims secured by property of the Debtors' bankruptcy estate (or that are subject to setoff) to the extent allowed as secured claims under § 506 of the Code.  If the value of the collateral or setoffs securing the creditor's claim is less than the amount of the creditor's allowed claim, the deficiency will be classified as a general unsecured claim.

The following chart lists Debtors' secured pre-petition claims and their proposed treatment under the Plan.  Here the primary secured creditor Legg Mason's interests are consolidated under a single security agreement and the claim is presented as a single claim against all three Debtors.

### 5.    Class 5:  Allowed Small General Unsecured Claims (Administrative Convenience Class)

General unsecured claims are not secured by property of the estate and are not entitled to priority under § 507(a) of the Code.   Unsecured claims are detailed in Debtors' Schedule F.  These claims are separated into two classes with Class 5 being claims $200 or less.

### 6.    Class 6:  Allowed General Unsecured Claims

General unsecured claims are not secured by property of the estate and are not entitled to priority under § 507(a) of the Code.   Unsecured claims are detailed in Debtors' Schedule F.  These claims are separated into two classes with Class 6 being claims $500 and above.

### 7.    Class 7:  Equity Interest Holders

Equity interest holders are parties who hold an ownership interest (*i.e.*, equity interest) in the Debtors.  In a corporation, entities holding preferred or common stock are equity interest holders.  In a partnership, equity interest holders include both general and limited partners.  In a limited liability company ("LLC"), the equity interest holders are the members.  Finally, with respect to an individual who is a debtor, the debtor is the equity interest holder.

The equity holders in the three Debtors are Java Investments, L.L.C. and Tammi Le.  Java Investments, L.L.C. and Tammi Le shall retain their ownership in the reorganized Debtors and their ownership in the property, subject to the the terms of the Plan(s).

C.      **Means of Implementing the Plans**

1.      **Sources of Payments and General Provisions**

Debtor shall each retain their individual property, restructure their debts and continue to operate their respective properties to generate ongoing Net Profits the ordinary course of business to fund the payments under the Plan(s).  In addition, Debtors will diligently pursue insurance claims under property damage insurance and business income loss insurance to maximize their entitled receipts under the applicable insurance policies.

2.      **Vesting of Assets**

Upon Confirmation, title to all assets and properties of the Debtors shall revest in the Reorganized Debtors, free and clear of all Claims and Interests, except as provided in the Plan(s), and the Confirmation Order shall be a judicial determination of discharge of all liabilities against the individual Debtors, except to the extent as provided under the Plan(s).

3.      **Post-confirmation Management**

Java Investments, L.L.C. and Tammi Le shall retain management control upon the Confirmation Date of the Plan(s) with Andrew Zel as the onsite designated agent.

4.      **Distribution of Consideration**

(a)      **Dates of Distribution** - Distributions shall be made on the Effective Date(s) or as otherwise provided in the Plan(s) or by order.

(b)      **Disbursing Agent, Duties and Compensation** - The Disbursing Agent shall be the Debtors' accountant, Mr. Michael P. Jayson, CPA.  The Disbursing Agent shall deposit the funds to be disbursed to Creditors under the Plan(s) to an approved non-interest bearing account, and then thereafter disburse those funds to Creditors in accordance with the Plan(s).  The Disbursing Agent shall be compensated as provided under the Plan(s).

**D.      Risk Factors**

The proposed Plan(s) have the following risks currently foreseen by the Debtors at the time of this Disclosure Statement:

1.      Adverse Economic Downturn - Debtors cannot control nor determine economic conditions in their market area.  A significant economic downturn or delayed economic recovery from the recent downturn may adversely impact achievable rental rates for units operated by Debtors as well as the number of units occupied.

2.      Physical Damages to Premises - Another significant storm event or fire event to properties may reduce the available units for rent and/or make surrounding units less desirable, reducing total income for the property.

3.      Delays or Inability to Adequately Recover From Insurance Proceeds - Although Debtors will pursue all entitled insurance claims diligently, there may be factors beyond their control which delay or preclude recovery on claims.

4.      Delays or Inability to Obtain Replacement Financing - Replacement financing depends on multiple factors in the marketplace and Debtors cannot provide complete assurance that this will be available to them on commercially reasonable terms.

**E.      Executory Contracts and Unexpired Leases**

The Plans lists all executory contracts and unexpired leases that the Debtors will assume under the Plans.  Assumption means that the individual Debtor has elected to continue to perform the obligations under such contracts and unexpired leases, and to cure defaults of the type that must be cured under the Code, if any.

If you object to the assumption of your unexpired lease or executory contract, the proposed cure of any defaults, or the adequacy of assurance of performance, you must file and serve your objection to the Plan within the deadline for objecting to the confirmation of the specific individual Plan, unless the Court has set an earlier time.

All executory contracts and unexpired leases that are not listed in the Plan as being assumed may be rejected.  Consult your adviser or attorney for more specific information about particular contracts or leases.

If you object to the rejection of your contract or lease, you must file and serve your objection to the specific Plan within the deadline for objecting to the confirmation of the Plan.

***The Deadline for Filing a Proof of Claim Based on a Claim Arising from the Rejection of a Lease or Contract Is Twenty (20) Days after the Effective Date.***  Any claim based on the rejection of a contract or lease will be barred if the proof of claim is not timely filed, unless the Court orders otherwise.

### F.    Tax Consequences of Plan

*Creditors and Equity Interest Holders Concerned with How the Plan May Affect Their Tax Liability Should Consult with Their Own Accountants, Attorneys, And/Or Advisors.*

### 1.    General

THE FOLLOWING DISCUSSION IS A SUMMARY OF CERTAIN SIGNIFICANT FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN TO THE DEBTOR AND TO HOLDERS OF CLAIMS AND EQUITY INTERESTS AND IS BASED ON THE INTERNAL REVENUE CODE OF 1986 (TITLE 26, UNITED STATES CODE), AS AMENDED TO THE DATE HEREOF (THE "TAX CODE"), TREASURY REGULATIONS PROMULGATED AND PROPOSED THEREUNDER, JUDICIAL DECISIONS AND PUBLISHED ADMINISTRATIVE RULES AND PRONOUNCEMENTS OF THE IRS AS IN EFFECT ON THE DATE HEREOF.  CHANGES IN SUCH RULES OR NEW INTERPRETATIONS THEREOF COULD SIGNIFICANTLY AFFECT THE TAX CONSEQUENCES DESCRIBED BELOW.  NO RULINGS HAVE BEEN REQUESTED FROM THE IRS.  MOREOVER, NO LEGAL OPINIONS HAVE BEEN REQUESTED FROM COUNSEL WITH RESPECT TO ANY OF THE TAX ASPECTS OF THE PLAN.

THE FEDERAL, STATE, LOCAL AND OTHER TAX CONSEQUENCES OF THE PLAN TO THE HOLDERS OF CLAIMS AND EQUITY INTERESTS MAY VARY BASED UPON THE INDIVIDUAL CIRCUMSTANCES OF EACH HOLDER.  IN ADDITION, THIS DISCUSSION DOES NOT COVER ALL ASPECTS OF FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO THE DEBTOR OR THE HOLDERS OF ALLOWED CLAIMS OR EQUITY INTERESTS (SUCH AS HOLDERS WHO DO NOT ACQUIRE THEIR CLAIM ON ORIGINAL ISSUE), NOR DOES THE DISCUSSION DEAL WITH TAX ISSUES PECULIAR TO CERTAIN TYPES OF TAX PAYERS (SUCH AS DEALERS IN SECURITIES, S CORPORATIONS, LIFE INSURANCE COMPANIES, FINANCIAL INSTITUTIONS, TAX-EXEMPT ORGANIZATIONS AND FOREIGN TAXPAYERS).  NO ASPECT OF FOREIGN, STATE, LOCAL OR ESTATE AND GIFT TAXATION IS ADDRESSED.

THE FOLLOWING SUMMARY IS, THEREFORE, NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES OF EACH HOLDER OF A CLAIM OR EQUITY INTEREST. HOLDERS OF CLAIMS OR EQUITY INTERESTS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS FOR THE FEDERAL, STATE, LOCAL AND OTHER TAX CONSEQUENCES PECULIAR TO THEM UNDER THE PLAN.  THE DEBTORS ASSUME NO RESPONSIBILITY FOR THE TAX EFFECT THAT CONFIRMATION AND RECEIPT OF ANY DISTRIBUTION UNDER THE PLAN MAY HAVE ON ANY GIVEN CREDITOR OR OTHER PARTY IN INTEREST.

No administrative rulings will be sought from the Internal Revenue Service (hereinafter **"IRS"**) with respect to any of the federal income tax aspects of the Plan.  Consequently, there can be no assurance that the treatment described in this Disclosure Statement will be accepted by the IRS.  No opinion of counsel has either been sought or obtained with respect to the federal income tax aspects of the Plan.

2.      **IRS Circular 230 Disclosure**

THIS DISCLOSURE STATEMENT IS WRITTEN TO SUPPORT THE TRANSACTIONS DISCUSSED HEREIN.  TO ENSURE COMPLIANCE WITH REQUIREMENTS IMPOSED BY THE IRS, THE DEBTOR IS INFORMING YOU THAT THIS DISCLOSURE STATEMENT IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY ANY TAXPAYER FOR THE PURPOSE OF AVOIDING TAX-RELATED PENALTIES THAT MAY BE IMPOSED ON SUCH TAXPAYER UNDER THE TAX CODE.  TAXPAYERS SHOULD SEEK ADVICE BASED ON THEIR PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

3.      **Consequences to Holders of Claims**

a.      **Realization and Recognition of Gain or Loss in General**

The federal income tax consequences of the implementation of the Plan to a holder of a claim will depend, among other things, upon the origin of the holder's claim, when the holder's claim becomes an Allowed Claim, when the holder received payment in respect of such claim, whether the holder reports income using the accrual or cash method of accounting, whether the holder has taken a bad debt deduction or worthless security deduction with respect to such claim, whether the claimant receives consideration in more than one tax year of the claimant, whether the claimant is a resident of the United States, whether all the consideration received by the claimant is deemed to be received by that claimant in an integrated transaction and whether the holder's claim constitutes a "security" for federal income tax purposes.

Generally, a holder of an Allowed Claim will realize gain or loss on the exchange under the Plan of its Allowed Claim for stock and other property (such as Cash and new debt instruments), in an amount equal to the difference between (i) the sum of the amount of any Cash and the issue price of any debt instrument (other than any consideration attributable to a claim for accrued but unpaid interest), and (ii) the adjusted basis of the Allowed Claim exchanged therefore (other than basis attributable to accrued but unpaid interest previously included in the holder's taxable income).  The treatment of accrued but unpaid interest and amounts allocable thereto varies depending on the nature of the holder's claim, such as (i) the nature and origin of the claim; (ii) the tax status of the holder of the claim; (iii) whether the holder is a financial institution; (iv) whether the claim is a capital asset in the hands of the holder; (v) whether the claim has been held for more than one (1) year; (vi) the extent to which the holder previously claimed a loss, bad debt deduction or charge to a reserve for bad debts with respect to the claim, and is discussed below.

Whether or not such realized gain or loss will be recognized (*i.e.*, taken into account) for federal income tax purposes will depend in part upon whether such exchange qualifies as a recapitalization or other 'reorganization" as defined in the Tax Code, which may in turn depend upon whether the claim exchanged is classified as a "security" for federal income tax purposes. The term "security" is not defined in the Tax Code or in the Treasury Regulations.  One of the most significant factors considered in determining whether a particular debt instrument is a security is the original term thereof.  In general, the longer the term of an instrument, the greater the likelihood that it will be considered a security.  As a general rule, a debt instrument having an original term of 10 years or more will be classified as a security, and a debt instrument having an original term of fewer than five years will not.  Debt instruments having a term of at least five

years but less than 10 years are likely to be treated as securities, but may not be, depending upon their resemblance to ordinary promissory notes, whether they are publicly traded, whether the instruments are secured, the financial condition of the debtor at the time the debt instruments are issued, and other factors. Each holder of an Allowed Claim should consult his or her own tax advisor to determine whether his or her Allowed Claim constitutes a security for federal income tax purposes.

### b.      Accrued Interest

The Debtor intends to take the position that all payments in respect of Allowed Claims will be first allocated to the principal amount of the Allowed Claim, with any excess allocated to accrued unpaid interest. However, there is no assurance that such allocation would be respected by the IRS for federal income tax purposes. In general, to the extent any amount received by a holder of an Allowed Claim is received in satisfaction of accrued interest during its holding period, such amount will be taxable to the holder as interest income (if not previously included in the holder's gross income). Conversely, a holder generally will recognize a deductible loss to the extent any accrued interest claimed was previously included in gross income and is not paid in full. Each holder of an Allowed Claim is urged to consult its tax advisor regarding the allocation of consideration and deductibility of unpaid interest for tax purposes.

A holder, who, under his accounting method, was not previously required to include in income, accrued but unpaid interest attributable to its existing claims, and who exchanges its interest claim for cash, or other property, pursuant to the Plan will be treated as receiving ordinary interest income to the extent of any consideration so received allocable to such interest, regardless of whether that holder realizes an overall gain or loss as a result of the exchange of its existing claims.

### 2.      Consequences to Debtor or Reorganized Debtor - Discharge of Indebtedness Income Generally

In general, the discharge of a debt obligation by a debtor for an amount less than the adjusted issue price (generally, the amount received upon incurring the obligation plus the amount of any previously amortized original issue discount and less the amount of any previously amortized bond issue premium) gives rise to cancellation of indebtedness ("***COD***") income which must be included in a debtor's income for federal income tax purposes, unless, in accordance with section 108(e)(2) of the Tax Code, payment of the liability would have given rise to a deduction. A corporate debtor that issues its own stock or its own debt in satisfaction of its debt is treated as realizing COD income to the extent the fair market value of the stock or the issue price of new debt issued is less than the adjusted issue price of the old debt. COD income is not recognized by a taxpayer that is a debtor in a title 11 (bankruptcy) case if a discharge is granted by the Bankruptcy Court or pursuant to a plan approved by the Bankruptcy Court (the "***Bankruptcy Exclusion Rules***").

The Debtors have not determined if any COD income will be realized pursuant to the Plan, but believes that the COD income, if any, will not be recognized by the Debtor due to the Bankruptcy Exclusion rules. However, the Debtor, as a result of the exception, may be subject to a reduction of certain of its "tax attributes" to the extent that COD income is not recognized under the Bankruptcy Exclusion Rules. Thus, while the Debtor will not recognize taxable income from discharge of indebtedness, it may experience reductions in (i) any net operating

losses ("*NOL*") that have accumulated, (ii) the tax basis of its property, and (iii) other tax attributes, as set forth in section 108(b)(2) of the Tax Code.

Nothing herein shall be construed as advice to the Reorganized Debtor. The Reorganized Debtor is relying solely on its own counsel and/or professionals for such advice.

## IV.   CONFIRMATION REQUIREMENTS AND PROCEDURES

To be confirmable, the Plan must meet the requirements listed in §§ 1129(a) or (b) of the Code. These include the requirements that: the Plan must be proposed in good faith; at least one impaired class of claims must accept the plan, without counting votes of insiders; the Plan must distribute to each creditor and equity interest holder at least as much as the creditor or equity interest holder would receive in a chapter 7 liquidation case, unless the creditor or equity interest holder votes to accept the Plan; and the Plan must be feasible. These requirements are <u>not</u> the only requirements listed in § 1129, and they are not the only requirements for confirmation.

### A.   Who May Vote or Object

Any party in interest may object to the confirmation of the specific Plan if the party believes that the requirements for confirmation are not met.

Many parties in interest, however, are not entitled to vote to accept or reject the Plan. A creditor or equity interest holder has a right to vote for or against the Plan only if that creditor or equity interest holder has a claim or equity interest that is both (1) allowed or allowed for voting purposes and (2) impaired.

In this case, the Plan Proponent believes that classes 2, 4, 5 and 6 are impaired and that holders of claims in each of these classes are therefore entitled to vote to accept or reject the Plan. The Plan Proponent believes that classes 1 is unimpaired and that holders of claims in each of these classes, therefore, do not have the right to vote to accept or reject the Plan.

### 1.   What Is an Allowed Claim or an Allowed Interest?

Only a creditor or equity interest holder with an allowed claim or an allowed equity interest has the right to vote on the Plan. Generally, a claim or equity interest is allowed if either (1) the Debtor has scheduled the claim on the Debtor's schedules, unless the claim has been scheduled as disputed, contingent, or unliquidated, or (2) the creditor has filed a proof of claim or equity interest, unless an objection has been filed to such proof of claim or equity interest. When a claim or equity interest is not allowed, the creditor or equity interest holder holding the claim or equity interest cannot vote unless the Court, after notice and hearing, either overrules the objection or allows the claim or equity interest for voting purposes pursuant to Rule 3018(a) of the Federal Rules of Bankruptcy Procedure.

*The deadline for filing a proof of claim in this case is February 11, 2009.*

### 2. What Is an Impaired Claim or Impaired Interest?

As noted above, the holder of an allowed claim or equity interest has the right to vote only if it is in a class that is *impaired* under the Plan.  As provided in § 1124 of the Code, a class is considered impaired if the Plan alters the legal, equitable, or contractual rights of the members of that class.

### 3. Who is Not Entitled to Vote

The holders of the following five types of claims and equity interests are *not* entitled to vote:

- holders of claims and equity interests that have been disallowed by an order of the Court;

- holders of other claims or equity interests that are not "allowed claims" or "allowed equity interests" (as discussed above), unless they have been "allowed" for voting purposes.

- holders of claims or equity interests in unimpaired classes;

- holders of claims entitled to priority pursuant to §§ 507(a)(2), (a)(3), and (a)(8) of the Code; and

- holders of claims or equity interests in classes that do not receive or retain any value under the Plan;

- administrative expenses.

***Even If You Are Not Entitled to Vote on the Plan, You Have a Right to Object to the Confirmation of the Plan and to the Adequacy of the Disclosure Statement***

### 4. Who Can Vote in More Than One Class

A creditor whose claim has been allowed in part as a secured claim and in part as an unsecured claim, or who otherwise hold claims in multiple classes, is entitled to accept or reject a Plan in each capacity, and should cast one ballot for each claim.

### B. Votes Necessary to Confirm the Plan

If impaired classes exist, the Court cannot confirm the Plan unless (1) at least one impaired class of creditors has accepted the Plan without counting the votes of any insiders within that class, and (2) all impaired classes have voted to accept the Plan, unless the Plan is eligible to be confirmed by "cram down" on non-accepting classes, as discussed later in Section B-2.

### 1.    Votes Necessary for a Class to Accept the Plan

A class of claims accepts the Plan if both of the following occur: (1) the holders of more than one-half (1/2) of the allowed claims in the class, who vote, cast their votes to accept the Plan, and (2) the holders of at least two-thirds (2/3) in dollar amount of the allowed claims in the class, who vote, cast their votes to accept the Plan.

A class of equity interests accepts the Plan if the holders of at least two-thirds (2/3) in amount of the allowed equity interests in the class, who vote, cast their votes to accept the Plan.

### 2.    Treatment of Non-accepting Classes

Even if one or more impaired classes reject the Plan, the Court may nonetheless confirm the Plan if the non-accepting classes are treated in the manner prescribed by § 1129(b) of the Code. A plan that binds non-accepting classes is commonly referred to as a "cram down" plan. The Code allows the Plan to bind non-accepting classes of claims or equity interests if it meets all the requirements for consensual confirmation except the voting requirements of § 1129(a)(8) of the Code, does not "discriminate unfairly" and is "fair and equitable" toward each impaired class that has not voted to accept the Plan.

***You should consult your own attorney if a "cram down" confirmation will affect your claim or equity interest, as the variations on this general rule are numerous and complex.***

### C.    Liquidation Analysis

To confirm the Plan, the Court must find that all creditors and equity interest holders who do not accept the Plan will receive at least as much under the Plan as such claim and equity interest holders would receive in a chapter 7 liquidation. The Debtors anticipate that creditors will receive more under this Chapter 11 Plan than in a chapter 7 liquidation based on the additional costs of a Chapter 7 and liquidation that would occur in a chapter 7 case.

Costs of liquidation under Chapter 7 of the Bankruptcy Code would include: (i) the compensation of the Chapter 7 Trustee; (ii) asset disposition expense; (iii) all unpaid expenses incurred by debtor in the Chapter 11 that are allowed in the chapter 7 case (such as compensation of attorneys and accountants); (iv) litigation costs; and (v) claims arising from operations during pendency of the chapter 11 case. The liquidation itself could trigger certain additional priority claims and would accelerate other priority payments that otherwise would be due in the ordinary course of business. Any additional priority claims also would be paid in full out of the liquidation proceeds before the balance would be made available to pay general unsecured claims.

If the cases were converted to chapter 7, there would be no disbursement to the unsecured (priority and general) creditors because the secured lender, Legg Mason, holds a security interest in all of Debtors' property, real and personal..

Under the Plans, the Debtors anticipate unsecured creditors will receive 100%.

### D.      Feasibility

The Court must find that confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtor or any successor to the Debtor, unless such liquidation or reorganization is proposed in the Plan.  Debtors believe the proposed Plans are feasible and Net Profits will be earned sufficient to pay creditors.  Debtors Exhibit "4" is Debtors' forecasted income and budget through 2015, presented by Debtors to be a reasonable representation of their financial outlook.

#### 1.      Ability to Initially Fund Plan

The Debtors, as Proponents of the Plans believe they will have enough cash on hand on the Effective Date of the Plans to pay all the claims and expenses that are entitled to be paid on that date.  The Debtors also represent  that they have a retainer on deposit with their bankruptcy counsel and their accountant that they believe will be sufficient to cover their attorney fees and accounting fees through confirmation.

#### 2.      Ability to Make Future Plan Payments And Operate Without Further Reorganization

The Plan Proponents must also show that it will have enough cash over the life of the Plans to make the required Plan payments.  The Debtors here as the Plan Proponents, present Exhibit 4, as their projected income and budgets showing adequate income to support their Plan payments.

*You Should Consult with Your Accountant or other Financial Advisor If You Have Any Questions Pertaining to These Projections.*

## V.      EFFECT OF CONFIRMATION OF PLAN

### A.      Discharge of Debtors

On the effective date of the Plans, the Debtors shall be discharged from any debts that arose before confirmation of the Plans, subject to the occurrence of the Effective Date, to the extent specified in § 1141(d)(1)(A) of the Code.  However, the Debtors shall not be discharged from any debts imposed by the Plans.  After the Effective Dates of the Plans your claims against the Debtors will be limited to the debts imposed by the Plans.

### B.      Modification of Plan

The Plan Proponents may modify the Plans at any time before confirmation of the Plans.  However, the Court may require a new disclosure statement and/or re-voting on the Plans.

The Plan Proponents may also seek to modify the Plans at any time after confirmation only if (1) the Plans has not been substantially consummated *and* (2) the Court authorizes the proposed modifications after notice and a hearing.

### C.      Final Decree

Once the estate has been fully administered, as provided in Rule 3022 of the Federal

Rules of Bankruptcy Procedure, the Plan Proponents, or such other party as the Court shall designate in the Plan Confirmation Orders, shall file a motion with the Court to obtain a final decree to close the case.  Alternatively, the Court may enter such a final decree on its own motion.

Respectfully submitted,

/s/ Andrew Zel
Andrew Zel, Managing Agent
Greens 126, L.P.
Oaks 198, L.P.
Trails 240, L.P.

OF COUNSEL:
Marjorie Payne Britt
TBN 15659700
marge@brittandcatrett.com
Michael Louis Catrett
TBN 24049057
mike@brittandcatrett.com
Britt & Catrett, P.C.
4615 Southwest Fwy Suite 599
Houston, TX  77027
Telephone: 713-666-0807
Facsimile:  713-355-8382

## EXHIBITS

1.   Plan of Reorganization - Greens 126, L.P., dated July 28, 2009

2.   Plan of Reorganization - Oaks 198, L.P., dated  July 28, 2009

3.   Plan of Reorganization - Trails 240, L.P., dated July 28, 2009

4.   Projected Income and Operating Budget

5.   Creative Property Management Resume

6.   Current Management Team Resumes

7.   Property legal description

8.   Property Appraisal dated August 4, 2008 (Summary and Table of Contents only;  full copies available on request, approximately 500 pages)

9.   Legg Mason Security Instruments